James J. Laughlin v. Commissioner.
Laughlin v. Commissioner
Docket No. 66021.
United States Tax Court
T.C. Memo 1965-47; 1965 Tax Ct. Memo LEXIS 285; 24 T.C.M. (CCH) 252; T.C.M. (RIA) 65047; March 4, 1965
*285 Petitioner, an attorney, received sums of money from clients throughout the years 1949 through 1952. Some of the money received was used by him to pay clients' litigation expenses. Petitioner failed to report substantial amounts of receipts from clients. Petitioner rented a portion of his office to a tenant and supplied the tenant with secretarial service throughout the four years in question. He did not report any of the rents and secretarial service fees in his tax returns. Held: 1. Total gross receipts determined. 2. Respondent's determination of allowable deductions from gross receipts sustained. Respondent is not improperly holding any books of account of petitioner needed by petitioner to prove error in the assertion of deficiencies. Petitioner never had any such books, adequate to reflect correctly his total income and expenses. 3. The statute of limitations is not a bar to the assessment and collection of taxes for the years 1949 through 1952, because petitioner filed false and fraudulent returns with intent to evade tax for each of those years. Fifty percent fraud penalties imposed. Additions to tax under sec. 294(d), I.R.C. 1939, also approved. James J. Laughlin, pro se, National Press Bldg., Washington, D.C., Joseph N. Ingolia and Charles S. Casazza, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in and additions to petitioner's income taxes for the years 1949 through 1952, inclusive, as follows: Additions to Tax
under 1939 Code
Section
Section
Year
Deficiency
293(b)
294(d)
1949
$3,975.32
$1,987.66
$627.90
1950
9,144.43
4,572.22
630.46
1951
776.41
388.21
85.06
1952
4,001.70
2,000.85
292.37
*287 Respondent has conceded that the addition to tax under section 294(d)(2) for the year 1949 was improperly asserted and should not be sustained. This concession will be given effect in a Rule 50 computation. The issues remaining for decision are: (1) Whether petitioner understated his income in the income tax returns he filed for the years 1949 through 1952. (2) Whether petitioner filed false and fraudulent returns for any of the years in question and whether all or any part of the deficiencies in income tax determined for each of said years are due to fraud with intent to evade tax. (3) Whether petitioner is liable for the addition to tax provided for by section 294(d)(1)(A) of the Internal Revenue Code of 1939 for failure to file a declaration of estimated income tax for the year 1949. (4) Whether petitioner is liable for the additions to tax provided for by section 294(d)(2) of the Internal Revenue Code of 1939 for substantial underestimation of estimated income taxes for the years 1950 through 1952. (5) Whether any statute of limitations bars assessment of any of the deficiencies in issue before us. Findings of Fact Some of the facts have been stipulated. The stipulation *288 of facts and exhibits attached thereto are incorporated herein by this reference, and adopted as our findings. Some of such facts will be related in detail in our findings hereinafter made. Petitioner is a lawyer engaged in the practice of his profession in the District of Columbia. During the years 1949 through 1952, inclusive, petitioner maintained an office in the National Press Club Building, Washington, D.C. He filed his income tax returns for each of those years with the collector or director of internal revenue for the district of Indiana. Although he spends virtually all of his time in Washington, where he has a home and maintains his law office, petitioner has an address in Indianapolis, Indiana, and he votes there. His tax returns here in question show no Indiana address but instead showed petitioner's home address each year to be 3830 Livingston Street, N.W., Washington, D.C. Petitioner's law practice during the period in question was a general trial practice with some concentration in the fields of domestic relations and criminal law. He appeared quite often on behalf of clients in the various courts of the District of Columbia and surrounding area, including frequent *289 appearances in appellate courts. A considerable portion of petitioner's activity during the period in question was devoted to "in forma pauperis" criminal cases in which he served as defense counsel for indigent persons accused of crime. He received no fees in such cases and sometimes incurred expenses on behalf of his indigent clients. Petitioner was often reimbursed for expenses incurred on behalf of indigent clients, but in other cases bore such expenses out of his own funds without reimbursement. In addition to indigent criminal defendants, petitioner represented others with varying capacities to finance their litigation. Some clients paid both expenses and an attorney's fee. Others paid only the expenses (or a portion thereof) and still others hired petitioner on a contingent fee basis in civil litigation. Clients who were able to pay their own litigation expenses either paid them directly or, as was quite often the case, they paid the amounts due to petitioner and petitioner paid the items of expense out of these funds. In other cases clients reimbursed petitioner for costs after he had paid them from his own funds. Sometimes petitioner would collect from the client only a *290 lump-sum fee, and he would pay all litigation expenses himself without collecting anything further from the client. During most of 1949 and the early part of 1950 petitioner employed a young associate attorney named William E. Owen. Owen worked under an informal arrangement with petitioner. Although at first he was primarily an assistant to petitioner, he gradually began to handle cases on his own. He sometimes received money from clients for services performed by petitioner or himself or both, and he always turned any money so received over to petitioner or to petitioner's secretary for deposit in petitioner's account. Petitioner paid Owen in an ad hoc manner at irregular times and in irregular amounts as petitioner saw fit. During 1951 and 1952 petitioner employed an associate named Albert J. Ahern. The parties have stipulated that in 1951 Ahern's gross income did not exceed $2,600 and in 1952 it did not exceed $5,500. [1]
*291 Throughout the period in question petitioner conducted his law practice in a rented office consisting of two rooms located in the National Press Club Building, Washington, D.C. Each year he deducted on his tax return the full amount of rent paid for this office. Petitioner and his secretary had desks in one room. The other room was used as a reception room. Petitioner sublet a portion of the reception room to a Pennsylvania company for use by its Washington, D.C. representative, Robert M. Penman. In addition, petitioner supplied to Penman the services of petitioner's secretary at a fixed monthly charge. Petitioner received the following annual amounts from Penman's employer for rent and secretarial service: Rent
Secretarial
1949
$579.00
$1,080
1950
579.00
1,080
1951
607.50
1,080
1952
636.00
1,080 None of these amounts was reported in petitioner's income tax returns, nor were petitioner's business expense deductions for rent or secretarial wages reduced proportionately. Throughout the period in question petitioner employed Evelyn Brownell as his secretary. She was given a power of attorney by petitioner and frequently signed receipts and endorsed *292 checks in petitioner's name. She handled petitioner's bank deposits, even when he was absent from the city for an extended period. Part of her time was spent providing services for Penman, though she received compensation only from petitioner. Petitioner deducted on his tax returns the full amount of compensation paid to Brownell. Petitioner was assisted in the preparation of his income tax returns for some of the years in question by agents of the respondent stationed in the National Press Club Building during tax-filing season to assist taxpayers in the preparation of their returns. Each time petitioner sought help in this manner he took with him various data which he referred to in supplying the assisting agent with figures which the agent used in making out the return. While the returns were filled out (at least in rough draft form) by the agents, they were based solely on the information and figures supplied by petitioner. He did not disclose all of his receipts to these agents. The information he did furnish was incomplete. In the latter part of 1951 an agent of respondent contacted petitioner regarding certain deductions claimed by petitioner on his 1949 tax return. The *293 agent who originally contacted petitioner in this matter was withdrawn from petitioner's case shortly after the original contact and replaced by an agent named Norman Woodrow Wilson. Wilson came to petitioner's office several times to confer with petitioner and to secure information and canceled checks. In the early part of 1953, after investigation of petitioner for possible tax fraud had begun, he was contacted by one of respondent's special agents. At this agent's request, petitioner went to the Internal Revenue Building late in April of 1953 and was there asked a series of questions in the presence of Wilson. Petitioner left this meeting before the special agent had finished his questioning. He agreed to resume the question and answer session, but he did not do so. Subsequently petitioner refused to cooperate any further in the investigation. The special agent asked petitioner several times to submit his books and records for examination. On April 27, 1953, when his first inquiry about books was made, petitioner informed this agent that he had both cash receipts and expenditures books which were kept in his garage and that as soon as he got them from this place of storage he *294 would make them available. On two subsequent occasions, toward the end of the next two succeeding months in 1953 petitioner was requested to make his books and records available to the agent for examination, but he never did so. Neither the special agent nor any of the other agents who testified at trial ever was shown or saw any of petitioner's books of account or records; respondent's employees who assisted petitioner in the preparation of his returns never saw any books or records either; they recalled that petitioner had his figures written on slips or sheets of paper which he brought along with him. Petitioner's secretary during the period from 1945 to 1953 never made entries in any books of account during the period of her employment in petitioner's law office and she never saw any such books or records there. She shared the same office with petitioner. Petitioner's associate and the subtenant shared the second room in the suite, which was also used as the reception room. Owen, petitioner's young associate in 1949 and 1950, likewise made no entries of receipts or disbursements in any books or records of petitioner and other than a receipt book used to give clients receipts *295 for fees he never saw any records, books of account or ledgers in petitioner's office. During the years 1949 through 1952, petitioner did not keep adequate or sufficient books of account or records for the recording of his professional receipts and expenses. Such books or records as he may have kept were not turned over to agents of respondent. When petitioner answered specific questions on April 27, 1953, asked by the special agent, he stated that he kept records consisting of receipts reflected in a receipt book and expenditures kept in a cash expenditure book; entries in these books were made by petitioner, his secretary or his associates, according to his statement then made. He also stated at that interview that all moneys and checks were deposited in his bank accounts except for small disbursements, and that deposits represented receipts from business except for proceeds of loans or money received for settlement of cases. He said at that time that some of his canceled checks and check stubs, books and records, settlement sheets, et cetera, were available for the past five years. He made no statement then to the special agent that any of his books or records had been turned *296 over to the revenue agent. The following month when the special agent again asked for additional checks, books and records, petitioner did not claim that his books had already been made available to another agent but at that time he did ask that checks he had furnished another agent be returned. One month later when these checks were returned to petitioner, request was made again for his books and records. At this time petitioner made no claim that they had already been furnished, and it was not until late in 1954 or early in 1955 that the special agent learned of petitioner's allegation that his books and records had been furnished to Wilson at an earlier date. The special agent and other agents of respondent carried on an extensive investigation of petitioner's financial affairs for the years 1949 through 1952. They canvassed the banks where petitioner had accounts, analyzing records of all checks drawn by petitioner and microfilms of checks deposited in these accounts. They also analyzed all cash and check payments for expenses such as service of process, filing fees and court costs, reporter's fees, and so forth, which they obtained by examining court records, and otherwise *297 going to the source. From the microfilm of checks payable to and deposited by petitioner and from docket records of courts in and around Washington, D.C., respondent's agents compiled a list of between 200 and 300 clients for whom petitioner had done legal work during the period in question. From their examination of checks and court records these agents also determined what most of petitioner's expenses were. For each year this examination resulted in an increase in income from petitioner's law practice and allowance of increased expenses above those claimed by petitioner in his returns. For example, in 1949, petitioner claimed no deduction described as expenses of serving process and marshal's fees whereas the examination disclosed allowable expenses of this nature totaling $101, which were deducted by respondent in computing the deficiency asserted for that year. The agents then (with added help in view of the size of the undertaking) sought out and interviewed most of the persons in their list of petitioner's 1949 through 1952 clients, obtaining from these persons affidavits concerning their relationship with petitioner and the amounts and dates of any payments made to him. Often *298 these clients were able to produce canceled checks or receipts evidencing payments to petitioner, which documents were turned over to or copied by the agents. Former clients who were outside the Washington, D.C. area were interviewed by agents from various branch offices of respondent. Petitioner became aware that respondent's agents were contacting his former clients. Petitioner too then began to contact his clients and in at least one instance a former client was asked by petitioner to turn over to him the receipts she had been given for substantial fees paid in 1952. She went to petitioner's office and turned over the receipts as requested and was further instructed that if she was questioned by anyone regarding these matters she should refer the inquiry immediately to petitioner. While petitioner's tax returns were being investigated and his clients were being interviewed by respondent's agents, petitioner himself began to investigate the background of agent Wilson. He learned that Wilson had a history of hospitalization for mental difficulties. Wilson had been hospitalized for a period of 15 months in 1938 and 1939. He was again hospitalized from March 5 until May 4, 1951. On *299 January 3, 1952, the Mental Health Clinic of the U.S.Public Health Service indicated to the Internal Revenue Service that in the opinion of the Public Health Service, Wilson was capable of performing adequately on any job for which his training and experience qualified him. Subsequently, Wilson was hospitalized again during most of the period from August to December, 1955. Petitioner also investigated the special agent on the case. He ascertained that the agent had been having domestic difficulties and petitioner questioned his dependency claims for tax purposes. Other of respondent's agents were likewise investigated by petitioner. On December 28, 1954, petitioner wrote a letter to the district director of internal revenue complaining about the activity of various agents involved in the investigation and asking for the return of certain records allegedly turned over to these agents and never returned. Sometime prior to February 10, 1956, petitioner instituted an action in the United States District Court for the District of Columbia in which petitioner charged respondent's agents who conducted the income tax investigation giving rise to the deficiencies before us with misconduct *300 of such serious nature that it would warrant their dismissal from the Revenue Service and criminal prosecution. He also alleged in this action that the agents were damaging and interfering with his legal practice. He claimed that in 1952 and 1953 he turned over some books and canceled checks to the respondent's agents and only received back some of the canceled checks. He apparently moved for a preliminary injunction to prevent the agents from interfering with his clients or his law practice and for an order to compel the agents to return the books and the balance of the canceled checks. [2]
In that proceeding the agents denied having received any of petitioner's books or checks or records which had not been returned and swore that they had returned everything they had received. The District Court Judge denied petitioner's *301 motion for an order directing return of said records without making any findings of fact or conclusions of law. In recorded remarks, a transcript of which was read from by petitioner before us without respondent's objection, the District Judge stated that both sides were telling the truth as they believed it. He reasoned that the conflicting views could be reconciled by saying that petitioner did give the agents certain books and records but that they could not be returned because the agent or agents had misplaced and forgotten about them. However, no specific findings of fact were made to this effect, and we do not know what evidence was before the District Court, if any, save for what might have been contained in affidavits referred to by the Judge. Neither do we know the eventual outcome of that case. Petitioner reported on his tax returns gross income from his law practice and expenses deductible therefrom as follows: 1949
1950
1951
1952
Gross income
$17,190.57
$19,650.00
$18,075.20
$25,125.00
Deductions
10,747.00
9,219.00
12,424.50
16,257.00
Net profit
$ 6,443.57
$10,431.00
$ 5,650.70
$ 8,868.00
Respondent in his notice of deficiency, *302 determined petitioner's income from legal practice as follows: 1949
1950
1951
1952
Total receipts [1]
$28,343.30
$51,021.88
$25,925.67
$41,252.07
Less: Referral fees and payments
to clients
66.67
8,092.15
5,675.44
5,951.68
$28,276.63
$42,929.73
$20,250.23
$35,300.39
Sub-lease & secretarial service
1,659.00
1,659.00
1,687.50
1,716.00
$29,935.63
$44,588.73
$21,937.73
$37,016.39
Less: Total expenses [1]
11,471.00
12,548.78
13,662.88
17,023.70
Income Legal Profession
$18,464.63
$32,039.95
$ 8,274.85
$19,992.69
The parties have stipulated that in the years before us petitioner received from certain named clients in connection with the performance of legal services no less than the following amounts: 1949
1950
1951
1952
$17,766.35
$33,334.30
$15,567.08
$29,941.38 They have also stipulated that in the period here involved petitioner *303 represented various other named clients in each year. From these clients petitioner received at least the following amounts in connection with the performance of legal services: 1949
1950
1951
1952
$3,079
$2,250
$2,749.10
$2,044.13 In addition petitioner represented other clients from whom he also received payments in the years before us. Petitioner's gross receipts from his law practice, office rent and secretarial fees, his allowable expense deductions therefrom and the net profits from his law practice as disclosed by the evidence of record were at least as follows: 1949
1950
1951
1952
Receipts [1]
$24,155.35
$37,354.30
$20,453.68
$34,725.89
Expenses [1]
11,471.00
12,548.78
13,662.88
17,023.70
Net profit
$12,684.35
$24,805.52
$ 6,790.80
$17,702.19
Petitioner's gross receipts and net income from his law practice in the years before us were understated *304 by substantial amounts in each of such years. In his determination respondent included in total receipts for 1950 the sum of $10,300 received by petitioner from a client named Maranites. Petitioner did not receive $5,500 of this total sum from this client in 1950. Petitioner received only $4,800 from Maranites in 1950. Findings of Ultimate Fact 1. Petitioner failed to file a declaration of estimated tax for the year 1949. 2. Petitioner substantially underestimated his income tax for the years 1950, 1951 and 1952. 3. Petitioner filed a false and fraudulent tax return for each of the years 1949, 1950, 1951 and 1952, with intent to evade tax, and part of the resulting deficiency each year was due to petitioner's fraud. Opinion Petitioner contends that respondent is barred from asserting any deficiency for the years 1949 through 1952 by reason of the 3-year statute of limitations in section 275(a) of the 1939 Code. [3] Respondent relies on the exception contained in section 276(a) which provides that in the case of a false or fraudulent return with intent to evade tax, a deficiency may be assessed at any time. He alleges that petitioner's returns for each of the years 1949, *305 1950, 1951 and 1952 were false or fraudulent and filed with intent to evade tax. Respondent alternatively alleges that petitioner omitted from his 1952 return an amount of gross income which exceeded 25 percent of the gross income reported in the return and that thus a 5-year statute of limitations applies to the assessment of a deficiency for 1952, under section 275(c). Respondent also relies on his allegation of fraud to sustain the 50 percent additions to tax under section 293(b), and asserts that additions to tax under section 294(d)(1)(A) and 294(d)(2) must be sustained because petitioner has raised no issue with respect thereto in his petition, nor did he present evidence to rebut the correctness of respondent's determination at trial. At the outset petitioner denies that there are any deficiencies in his income as he reported it. Respondent contends that petitioner's receipts from his law practice were greatly understated each year. [4] Agents of respondent attempted to reconstruct petitioner's business receipts and expenses by canvassing bank and court records and court dockets, interviewing *306 hundreds of persons who were clients of petitioner during the period, and procuring from them signed statements and/or canceled checks or receipts concerning amounts paid to petitioner in 1949, 1950, 1951 and 1952. The deficiency asserted against petitioner is based largely upon the results of this investigation. Although petitioner has stipulated that he actually received a large amount of the receipts attributed to him as a result of this investigation, he denies having received all of the amounts originally determined. In addition, his principal contention is that even if he did actually receive more than he reported as total receipts on his returns there was, nonetheless, no understatement of taxable income since the excess represented non-income receipts and deductible expenses which were not taken as deductions. He contends that clients would often pay him money which was not a fee but which was to be used by him on behalf of the client to pay litigation expenses. He frequently would *307 deposit such payments to his own account and later use his own cash or draw his own check to make the payment for which the money he received had been advanced. He claims that often his arrangement with clients was to charge them only a fee out of which he would himself pay all litigation expenses with no further payment by the client. Thus, he contends that the receipts not reported in his returns consisted of advances (or reimbursements) of litigation expenses and portions of fees later paid out for litigation expenses. He claims, for example, that if a client paid him $3,000 and expenses of the case amounted to $1,100 which he paid, he only reported receipt of the net amount, $1,900, in his income tax returns, and did not deduct the expenses. We do not doubt that sometimes petitioner received payments which represented money due to clients or money from clients which were to be used to pay litigation expenses. We also believe that petitioner may have paid litigation expenses for clients out of the fees he received without showing a deduction for the expense on his tax return. However, whenever a receipt was ascertained to be of a non-income nature, such as an advance of expenses *308 or payment of an amount due to a client, the respondent, in calculating the amount of the asserted deficiency, made allowance for such items. Petitioner stated when he was first interviewed by respondent's agents that all moneys and checks were deposited in banks except for some small disbursements and that all money deposited represented receipts from his practice except for loan proceeds and proceeds of the settlement of cases. Respondent made a thorough and painstaking analysis of all bank records and accounts upon which his deficiency determination was based. In each year business expense deductions in excess of those claimed were allowed and non-income items included in total receipts were not included in the determination of net income since they were subtracted from the gross receipts as shown by our finding of fact. Petitioner has not shown any failure of respondent to recognize the non-income nature of any receipt items for any year. Nor has he shown any expense for which deduction was not allowed. Although petitioner has not argued it, we recognize that his failure to claim all the expense deductions to which he was entitled is evidence to be considered in determining the *309 presence or absence of a fraudulent intent. We have so considered it together with all the other evidence of record. Under respondent's determination a large understatement remains even after his allowance for expense deductions and non-income items. This is because, as the evidence clearly shows, petitioner's gross receipts from his law practice were substantially greater than the gross receipts he reported, and his expenses were not proportionately larger than those claimed. Also, petitioner failed to report as income each year in excess of $1,600 received from his subtenant as office rent and secretarial fees. Petitioner had the right to furnish leads or supply information during the investigation or to offer evidence at trial to show that he incurred and paid expenses of carrying on his practice or in behalf of clients in excess of the amounts allowed. If he had such additional expenses the burden was on him to prove them. United States v. Bender, 218 F. 2d 869 (C.A. 7, 1955), certiorari denied 349 U.S. 920 (1955); Davis v. United States, 226 F. 2d 331 (C.A. 6, 1955). Petitioner here has not done so. The deficiency notices were issued *310 on November 28, 1956, and the petition was filed herein on February 26, 1957. Over six years elapsed before trial during which time petitioner had ample opportunity to secure evidence of his expenditures if in fact they exceeded the amounts allowed. Any such items which would reduce his tax liability are peculiarly within petitioner's own knowledge and if he had additional costs or expenses to lessen or offset the unreported receipts each year, he should have proved same before us. He, far better than respondent, knew the investigators, the reporters, the stenographers and all of the other various suppliers of services to law-yers with whom he did business in the years in question. We find it amazing, to say the least, that if such additional expenses were incurred, petitioner, an experienced trial lawyer, produced no evidence whatever to bolster his assertions. However, he has not even made an effort or attempt to do so, and the record before us contains only lengthy and vague generalities inadequate to be considered as establishing anything whatever here with respect to his claims. Petitioner's sweeping assertions as to such additional professional expenses are unconvincing. We must *311 reject them, and since there is no reliable evidence as to amounts expended in excess of those allowed, respondent's determination of non-income receipts and deductible expenses must stand. Paul Masters, 25 T.C. 1093 (1956), affd. 243 F. 2d 335 (C.A. 3, 1957). Petitioner claims that he is unable to prove the incorrectness of respondent's determination because he did not have access to certain cash receipts and disbursements books which he allegedly kept during the years in question. He steadfastly contends that he turned these books over to respondent's agent, Wilson, upon the agent's request, and that Wilson never returned them. Petitioner attempts to reinforce the veracity of these allegations with his contention that agent Wilson was "insane" and that it would not be unlikely for such a man to have destroyed or misplaced petitioner's books and deny to everyone that he had ever received them. Wilson did not testify at trial. While agent Wilson's history of hospitalization for mental problems lends some credence to petitioner's contention that Wilson may not have conducted himself properly during his investigation of petitioner, and that he might have *312 lost or mislaid petitioner's records, other evidence has convinced us that petitioner in fact never kept and never had any reliable books such as he alleges were given to Wilson and not returned. Also, we are convinced that petitioner never turned any books over to Wilson. Petitioner contends that he gave the books to Wilson in late 1951 or early 1952. One of the witnesses who testified at trial was the special agent who had been called into the investigation of petitioner in April of 1953. He testified that when he asked petitioner for his books at that time petitioner informed him that they were stored at home in his garage. Petitioner testified that he made entries in these books on the average of once every two days - yet he was unable or unwilling to describe his books at trial. He testified that his secretary and associates knew about the books and when he was initially interviewed by respondent's special agent he stated that entries were made by him, by his secretary or by his associates. However, none of the witnesses who might logically have been able to corroborate petitioner's contentions about his books did so. His secretary, who sat at her desk in the same office room *313 with petitioner and who was so entrusted with his financial affairs that she received and receipted for money from clients, made bank deposits to his account, and had a power of attorney to sign his name, could not say whether or not he kept books. She testified positively that she never made any entries in books and she never even saw such books at any time. Petitioner's associate during parts of 1949 and 1950, who worked closely with petitioner in his office, never saw any books of account of petitioner and denied ever having made entries therein. The special agent who worked with agent Wilson from early in 1953 testified that he never saw any books in possession of petitioner or Wilson, and he also never saw any such books in the files or records of the investigation. Two of the agents who had assisted petitioner in the National Press Club Building during the years in question testified that they did not see or use petitioner's books in connection with preparing the returns; that petitioner did not refer to any books during these sessions and further that they had no reason to think that petitioner had any books with him. Finally, petitioner's own self-contradictory statements *314 and testimony on the question of his books calls to mind the apposite "Oh, what a tangled web we weave, when first we practice to deceive." [5] When asked by the special agent to produce his books in April of 1953, he agreed to do so when he got them from his garage where they were stored. He testified at trial that when he sought the assistance of agents of the Internal Revenue Service each year he took his books along and referred to them while discussing his returns. This occurred in March of 1950, 1951, 1952 and 1953. Yet he testified before us that he turned over these alleged books to agent Wilson in late 1951 or early 1952 and never received them back. Petitioner does not explain why he told the special agent he had his books stored in his garage in April of 1953 or how he could have had his books with him when his returns were made out in 1952 and 1953 if he gave them to Wilson in 1951 or 1952 and never saw them thereafter. Petitioner likewise fails to explain why he did not advise the special agent that he had previously given his books to Wilson on the three occasions in 1953 that requests for them were made if they had in fact been given to Wilson shortly before. *315 As further proof that respondent lost his books, petitioner leans heavily for support upon the fact that he wrote letters to Internal Revenue Service officials asking for the return of his books and, further, that he instituted an action in Federal District Court to compel their return. However, these were afterthoughts and only took place some time after petitioner had determined not to cooperate further in respondent's investigation and after he had learned about agent Wilson's history of mental illness. In April, May and June of 1953 no such contentions were made, and as far as we know it was a year or more later before petitioner began to demand return of his records. In December, 1954, he wrote asking for return of his records and at that time he stated that he had made earlier requests to the same effect, but he produced no evidence to establish this. While these unilateral actions on his part might be regarded as indicating that petitioner may have turned over some books to agent Wilson, or as corroborating petitioner's testimony to that effect, they certainly do not establish that fact. We observe, in passing, that it is not entirely unlikely that petitioner took these *316 actions in an effort to forestall the inquiry or to create or build up a defense for himself to be used in facing the consequences he foresaw would result from the investigation by respondent's agents. [6]
Petitioner insists that there was a judicial determination in the earlier District Court action that he turned over his books and records to respondent and that this Court is bound by that finding and cannot "go behind" it. Although his briefs are not entirely clear, we gather he urges us to apply res judicata or collateral estoppel to the end that his failure to produce books or to prove anything with respect to income or expenses will be excused. There is a complete lack of sufficient evidence in the record before us to justify the application of either doctrine, and we are not bound by the alleged finding of the District *317 Court relied upon by petitioner here. In the first place, although petitioner made repeated references to the District Court suit in arguments before us, he offered little evidence of any kind about it. A representative of the District Court appeared at trial with files and records, but neither they nor copies thereof found their way into the record of this case. We do not even have before us copies of the pleadings in that action. Petitioner, not when testifying under oath but when trying his case as advocate pro se before us, read from an unidentified paper purporting to be a ruling or informal remarks of the District Judge in that action. He has further quoted at length from such a document on brief. However, arguments or statements of counsel during trial or in briefs are not evidence and will not be regarded as such by us. With these preliminary remarks, we note that, even assuming that the District Court's ruling is in evidence before us, at most we could find that in denying Laughlin's preliminary motion for return of his books in the District Court action, the judge there made some informal remarks from the bench in which he rationalized that the books in question had been *318 delivered to respondent's agents but had probably been misplaced or forgotten by them. Even if we further assume that this amounted to a finding of fact, which is doubtful to say the least, res judicata and collateral estoppel only attach to findings of "ultimate" facts which are essential to a final determination of the issues being decided. From the evidence before us we do not even know what the issues were in the District Court case and so here application of either doctrine is not proper. The Evergreens v. Nunan, 141 F. 2d 927 (C.A. 2, 1944), affirming 47 B.T.A. 815; Sam Schnitzer, 13 T.C. 43 (1949), affd. per curiam 183 F. 2d 70 (C.A. 9, 1950). Furthermore, the lack of evidence concerning the District Court case makes us unable to determine exactly who the litigants were in that case. For res judicata or collateral estoppel to apply it must be clearly shown by competent evidence of record that the parties in the prior action were identical to or in "privity" with those in the action in which the estoppel is invoked. Strother v. Commissioner, 55 F. 2d 626 (C.A. 4, 1932), affd. sub nom. Strother v. Burnet, 287 U.S. 314 (1932). *319 This identity of parties has not been shown in the instant case. Also, petitioner has not shown that the District Judge's remarks were made in connection with a final adjudication on the merits or even that there has ever been a final judgment of any kind in the District Court case. From what we are able to gather from statements of counsel and the sparse evidence of record, the Judge's remarks were made only in conjunction with the denial of a preliminary motion made by petitioner for an order directing return of his alleged books. There is some indication that the District Court Judge heard no evidence whatever but merely ruled on this interlocutory motion on the basis of supporting and opposing affidavits. We stress once more that the record before us does not disclose what the eventual outcome or final adjudication was in the case or if any final determination was ever made. Again the evidence before us with respect to this is lacking. It is clear that collateral estoppel cannot apply in such a situation. It only applies when there has been a final adjudication of an issue on the merits - not to a Judge's granting or denial of a preliminary motion, as apparently was the case *320 here. Holmes v. Donald, 84 F. 2d 188 (C.A. 5, 1936) and several cases therein cited. During the trial and on brief the petitioner repeatedly asserts that if the respondent did not want to be bound by the finding in the District Court case, respondent should have taken an appeal from the ruling made by the District Judge. This argument overlooks the fact that there is no evidence before us that the respondent was a party defendant there. It also ignores the fact that the ruling was in favor of the defendants and that if respondent had been one of them, naturally he would not have appealed from a ruling in his favor even if the order were an appealable one. Here he could not have sought an appeal from the order denying the plaintiff's motion because it was not a final order from which appeal would lie and also because the ruling was in his favor. To apply estoppel under such circumstances would produce "a situation where the Government was to be bound by an order not subject to review." Cf. Laughlin v. United States, - F. 2d - (C.A.D.C., February 11, 1965). Finally, collateral estoppel only applies to specific factual determinations clearly made in the prior action *321 essential and necessary to the result reached there as well as to the result in the second suit. We have recently had occasion to review the fundamental legal principles involved in the application of collateral estoppel to tax litigation. John W. Amos, 43 T.C. 50, 54 (1964), on appeal (C.A. 4, Jan. 21, 1965). As we there pointed out, for the doctrine to apply to establish a fact in question conclusively, determination of that fact must have been necessary or essential to the result in the first suit and it must be also an "ultimate" fact for determination in the second suit. It was not necessary or essential to the determination in the first suit here involved that any finding be made to the effect that petitioner had turned over his books and records to revenue agents. This fact was not ultimate but was "mediate" or "evidentiary" at most. Cf. The Evergreens v. Nunan, supra.Actually the finding was not even a necessary "mediate" one to the District Court's ruling so it need not have been made at all. The doctrine of collateral estoppel certainly does not apply to dictum or other extraneous judicial remarks in the first suit. Mutual Organge Distributors *322 v. Agricultural prorate Commission of California, 30 F. Supp. 937 (S.D.Calif., 1940). The recent victory of petitioner in other litigation to which he was a party (Laughlin v. United States, supra) and which also involved the application of collateral estoppel does not aid him here. The opinion in that case shows that the facts involving the application of estoppel are clearly distinguishable from those before us. The fact which the Government was estopped to relitigate was an "ultimate fact" in the first case and there had admittedly been an appealable final judgment in that case, which had not been appealed by the United States. Here the facts which petitioner contends we are bound to adhere to and cannot "go behind" were neither "ultimate" in the first litigation nor are they "ultimate" now, and not only was there no final judgment or appealable order entered in the first case, but the respondent (if a party there) was the victorious party. It is clear that for all of the above reasons we are in no way bound by the informal comments of the District Judge in the earlier action. We cannot and do not hold that respondent is estopped to deny that petitioner delivered *323 his books to the investigating agents and that such agents are wrongfully retaining those books. Considering the entire record we cannot believe petitioner's story about these alleged books and on all of the evidence before us we have concluded that he never kept any adequate books from which his true income or expenses could be determined, nor did he ever turn any books over to respondent's agents. We must reject petitioner's arguments that we are powerless to make these findings. Petitioner was certainly not limited to his alleged books in seeking to establish either that his receipts were nontaxable or that he had larger expense deductions than respondent allowed. As a matter of fact he no doubt would have been required to prove his allegations by other means even if he had produced his books and he had been put to his proof. He had ample opportunity to locate and present other evidence such as canceled checks, duplicate deposit slips, bank records, receipts from payces or even direct testimony of payees or of his clients whom he claimed paid him for expenses. He certainly was not compelled to rely exclusively upon his "missing" books and that he did so was apparently his deliberate *324 choice. Petitioner has made no showing that his books, without more, would have been adequate to support his claims. On the contrary the evidence of record convinces us that any books petitioner did maintain were inadequate and we have so found. He has not asserted that other evidence to establish receipts or payments is unavailable or missing. Even as late as March 21, 1962, in his reply to respondent's answer filed herein, petitioner admitted that certain records of his cash receipts had not been turned over to respondent's agents. He claimed at that time that he was unable to locate "a certain cash receipt book" which had been misplaced. This book was not produced at trial. Also, at trial petitioner insisted that he had records of expenses on sheets of paper with him each year when his returns were prepared. Where were these expense records at time of trial? Petitioner has not shown why he failed to prove any receipt of non-income items or payment of expenses beyond the amounts he has been allowed. Having thus found no substance to petitioner's alleged excuse for inability to disprove the correctness of respondent's determination of total deductible expenses and non-income receipts *325 we sustain respondent's determination of this figure. Cf. Davis v. United States, supra. The total receipts figure disclosed by the evidence less the deductible expenses and non-income receipts results in a net profit from profession which exceeds that reported for each of the years in question as follows: 1949
1950
1951
1952
Total receipts (as determined from the evidence)
$24,155.35
37,354.30
$20,453.68
$34,725.89
Less Non-income receipts and deductible
expenses
11,471.00
12,548.78
13,662.88
17,023.70
$12,684.35
$24,805.52
$ 6,790.80
$17,702.19
Net profit as reported by petitioner
6,443.57
10,431.00
5,650.70
8,868.00
Amount of understatement
$ 6,240.78
$14,374.52
$ 1,140.10
$ 8,834.19
The "amount of understatement" shown immediately above includes petitioner's net profit from profession and receipts from rental of a portion of his office space and from secretarial services furnished his tenant. The total deficiency in net taxable income as determined by respondent is somewhat larger by reason of increased gross receipts and respondent's disallowance of certain other itemized deductions. These additional receipts *326 and disallowances must be sustained due to petitioner's failure to prove them incorrect; however, they will not be considered in our analysis of the fraud question and in determining whether or not respondent has carried his burden of proving fraud by clear and convincing evidence. In determining presence or absence of fraud we will consider only the understatements of gross receipts and net income established by the evidence as set forth in the immediately preceding table of figures. [7]
The key questions for decision here are whether the income tax returns filed by petitioner for the years in question were *327 false and fraudulent and filed with intent to evade tax and whether any part of the deficiency for each of such years is due to fraud. These are questions of fact to be determined from the whole record. Section 1112 places the burden of proving fraud on the respondent, and it must be proven by clear and convincing evidence. Luerana Pigman, 31 T.C. 356 (1958); Arlette Coat Co., 14 T.C. 751 (1950). Fraudulent intent can seldom be established by direct proof of the taxpayer's state of mind, and proof of fraud if it is to be established must depend to some extent on circumstantial evidence. It is usually found by surveying the taxpayer's whole course of conduct and is adduced (as any other fact) from all the evidence of record and inferences properly drawn therefrom. M. Rea Gano, 19 B.T.A. 518 (1930), Luerana Pigman, supra.Viewing the whole record before us, we have no question whatsoever that respondent has amply carried his burden by clear and convincing evidence. Our findings are based on numerous factors, only some of which we shall briefly review here. We have found on the evidence adduced at trial that petitioner understated *328 his business receipts and net income for each of four consecutive years. These understatements established by the evidence are quite large in proportion to the amounts actually reported. Understated net income ranges from a low of approximately 20 percent of the amount reported (1951) to a high of just over 135 percent (1950), and for the 4-year period it totaled in excess of $30,000, or only slightly less than 100 percent. The consistent failure to report substantial amounts of income over a number of years is effective evidence of fraud. Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16 (1938). Petitioner also reported no income from rents or from secretarial service payments received from his subtenant in each year, nor did he give effective treatment for tax purposes to these payments by corresponding reductions in his office rental or secretarial wage deductions claimed on his returns. He gave no convincing or satisfactory explanation at trial for this failure to report these substantial income receipts, and *329 we are persuaded that they were not reported. Such omissions from income tax returns which are not justified or explained support a finding of fraud for each year before us. Cf. Blatchford v. Commissioner, 337 F. 2d 1010 (C.A. 3, 1964), affirming per curiam a Memorandum Opinion of this Court. Petitioner filed his tax returns for each of the years in question in Indiana. The reason for doing so was never explained. He testified that he had an address in Indiana and that he votes there. We do not know why petitioner still maintains an address there, nor what is located at that address. We do know that petitioner's home and office have both been maintained in Washington, D.C. for many years. There was no evidence that he spent any time during the period in question in Indiana. When asked why he filed his tax returns in Indiana, his reply was that he had a right to file his return there and that a friend was running for office out there. It is unexplained what that had to do with the place of filing income tax returns. The respondent argues that there is a strong inference that the action of the petitioner in filing his income tax returns in a district other than the *330 one where he resided and maintained his principal place of business was designed to evade the regular examination of his return, in due course, and the determination of his true tax liability. While we reject this contention we certainly can consider this evidence as casting light on the presence or absence of a fraudulent intent. Petitioner's belligerent conduct and obvious lack of cooperation during the course of investigation by respondent's agents tends to indicate that he did not wish to reveal the information sought. Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954), certiorari denied 348 U.S. 912 (1954), affirming a Memorandum Opinion of this Court. Petitioner even admits the lack of cooperation. He maintains that it is only natural that he would not be willing to cooperate with agents who he alleges were impertinent, insulting, bent on harassment and generally acting improperly. Petitioner has not corroborated these allegations concerning the conduct of respondent's agents which they emphatically deny. We reject them in their entirety. However, even if they were true, which in candor we could not find, this is not a satisfactory excuse or plausible *331 explanation for failing to help to bring to light the facts which would exonerate petitioner if indeed he had paid all his taxes legally due. No matter how much a taxpayer may dislike being investigated by revenue agents, an innocent taxpayer generally nevertheless does whatever may be necessary to help show his true tax liability. Petitioner's actions were not just negative or passive resistance. He took affirmative action to harass the agents, thwart the investigation and prevent discovery of the facts. He investigated the agents, wrote letters of complaint to their superiors, and filed suits against several of them. He secured receipts for substantial fees sought by respondent from a potential witness and instructed her not to discuss the matter with the agents. In the light of our finding that there is no substance or merit to petitioner's allegation of impertinent or improper actions by the agents, such conduct of petitioner is not consistent with his innocence or a clear conscience. "Conduct of this nature is indication of an effort to conceal the true facts concerning income." Bryan v. Commissioner, supra; J. K. Vise, 31 T.C. 220, 226 (1958), affd. *332 278 F. 2d 642 (C.A. 6, 1960). Petitioner did not keep complete or accurate records of his revenues and his expenditures. This fact of itself is not necessarily indicative of any fraudulent intent especially in view of the degree of petitioner's activity, the large number of his clients each year, and the quite frequent receipts and expenditures of small sums in the day-to-day course of his practice. However, when it is viewed with all of the other evidence before us, it is hard for us to believe that an understatement of taxable income over a 4-year period averaging nearly 100 percent of reported income resulted from mere oversight or excusable inefficiency in bookkeeping. Also, we do not believe and cannot give credit to petitioner's claim that he only reported his net fees as his gross receipts in his returns. This claim is belied by his specific deductions each year for printing briefs, witness fees, investigations, travel, et cetera. If he reported only net amounts, why would he have not done so with consistency? He never explained why this might have been true with respect to some clients but not as to all. Also, revenue service employees who assisted petitioner *333 with his returns each year used the information and data petitioner supplied to them. They reported gross receipts in accordance with data furnished and then claimed the expense deductions also supplied by petitioner. Obviously, the information given them was neither complete nor accurate. Petitioner's consistent failure to advise the preparers of his returns of all of his receipts is evidence of a fraudulent intent to conceal income and evade taxes thereon. Nathan Bilsky, 31 T.C. 35 (1958). In the case at bar we are not dealing with a taxpayer entirely unfamiliar with the law and its requirements. Petitioner is an experienced and well-known member of the bar who makes his living as a trial lawyer in a profession requiring a considerable intellect. While we prefer to think that membership in the bar and the legal profession should create an inference of honesty and integrity, we realize that such a background also creates an inference that the individual knows what the law expects of him. J. K. Vise, supra.Cf. First Trust and Savings Bank of Davenport, Iowa v. United States, 206 F. 2d 97 (C.A. 8, 1953). To be sure, petitioner's legal practice *334 during the period before us involved no specialization in taxation as far as the record shows. However, he was not entirely unfamiliar with the tax law. He testified that he had, many times prior to the years in question, had conferences with internal revenue agents concerning returns he had filed. Certainly petitioner knew what was expected and required of him by his Government with respect to his income taxes. Cf. Fred N. Acker, 26 T.C. 107 (1956), affd. on this issue 258 F. 2d 568 (C.A. 6, 1958). Even the most unsophisticated business or professional man would know enoughto include in his income tax returns all of the income from subletting of office space and supplying secretarial service to his subtenant - especially when his entire rent expense and secretary's salary are taken as deductions. Cf. Foley v. United States, 290 F. 2d 562 (C.A. 8, 1961), factually quite similar to the instant case in many ways. This failure to report any of the rent and secretarial service income, even when viewed in isolation from the other unreported receipts, is persuasive evidence of fraud. See Blatchford v. Commissioner, supra; William H. Parsons, 43 T.C. 378 *335 (December 31, 1964). In the light of petitioner's background, and in the light of the record as a whole, including but not limited to his not-believed excuse why business books and records were not produced or available, his filing of tax returns in a distant state, his failure to disclose his gross receipts to the revenue service employees who helped prepare his returns; his failure to cooperate with respondent's agents and his efforts to harass them and thwart their investigation; his substantial understatements of income for each of four successive years, and his conduct and demeanor at trial, we are convinced, and have found as a fact, that his tax returns for each of the years 1949 through 1952 were false and fraudulent and filed with intent to evade tax. Merritt v. Commissioner, 301 F. 2d 484 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court; Estate of Jacques Granat v. Commissioner, 298 F. 2d 397 (1962), affirming a Memorandum Opinion of this Court; J. K. Vise, supra; cf. Foley v. United States, supra. Having so decided, we hold that no statute of limitations bars the assessment of deficiencies and that petitioner *336 is liable for the 50 percent additions to tax. Thus, we need not decide whether the 5-year statute of limitations of section 275(c) applies to the year 1952. The great majority of the individual items making up respondent's determination of petitioner's total receipts for each year were established by stipulation of the parties or by competent evidence of record. With one exception the small portion which was not so established and which we have not considered with reference to the fraud issue must stand, nonetheless, in computing the deficiencies by virtue of the presumption of correctness attaching to respondent's determination. The burden of proof to overcome this presumption rests on petitioner. He has failed to show error in respondent's determination except for $5,500 of the Maranites (Rexrode) fee included in receipts for 1950. Petitioner has carried his burden of proof with respect to that one fee. As we have already stated petitioner has also failed to prove additional expense deductions. For the purpose of computing the deficiencies and additions to tax pursuant to this opinion we hold that petitioner had actual net income from the practice of his profession (including *337 rent and secretarial services) for the years 1949 through 1952 as follows: 1949, $18,464.63; 1950, $26,539.95; 1951, $8,274.85 and 1952, $19,992.69. Petitioner has also failed to carry his burden of proof with respect to respondent's disallowance of certain itemized non-business deductions taken by petitioner on his returns. He has failed to prove payment or to establish deductibility. Respondent's disallowance of these deductions must therefore be sustained. No issue has been raised or evidence presented with respect to the additions to tax under section 294(d) and they therefore are sustained with adjustments to take into account our disposition of the amount of the deficiencies. Decision will be entered under Rule 50. Footnotes
1. The parties stipulated during trial that petitioner paid Owen $450 in 1949 and $1,593 in 1950, and Ahern $2,672 in 1951 and $4,837.91 in 1952. The total of fees to associates and wages paid by petitioner were stipulated to be as follows: 1949
$4,220.00
1950
5,493.00
1951
6,772.00
1952
8,527.91
In his income tax returns for those years petitioner claimed deductions for salaries and wages paid in connection with his law practice as follows: ↩
1949
$4,375
1950
4,950
1951
6,750
1952
8,600
2. No copies of the pleadings were offered into evidence before us, and we do not know who the parties were in that case or what issues were ultimately decided, if any. The evidence with respect to that proceeding is very scant and unsatisfactory, most references being made in statements of counsel and very little being presented by testimony or documentary evidence.↩
1. Included in both the receipts and the expenses are amounts received by petitioner from clients to be used by him specifically for payment of litigation expenses. Since these amounts are included in both receipts and deductions they do not affect net profit.↩
1. Included in both the receipts and the expenses are amounts received by petitioner from clients to be used by him specifically for payment of litigation expenses. Since these amounts are included in both receipts and deductions they do not affect net profit.↩
3. All statutory references herein are to the internal Revenue Code of 1939.↩
4. Respondent also disallowed certain non-business deductions taken by petitioner, but petitioner has either not contested or not sufflaently proved the incorrectness of these adjustments.↩
5. Walter Scott: Marmion, V1, St. 17.↩
6. That this explanation is not beyond reasonable probability is made clear by evidence of record tending to indicate that petitioner is a litigatious person, not at all unlikely to launch a vigorous offense in self-defense either by beginning an investigation of or by instituting charges or litigation against those who would investigate or challenge him.↩
7. For the purpose of deciding the fraud issue, where the burden rests on respondent, we have determined petitioner's gross receipts and net income in accordance with the clear and convincing evidence of record that establishes the same. However, for the purpose of determining the annual deficiencies, where the burden of proof rests on petitioner, we have included in income in addition to the items proved by clear and convincing evidence before us, income determined by respondent and not disputed or disproved by any evidence produced by petitioner as hereinafter detailed.↩